## McEBRIGHT v VOGEL

Ohio Appeals, 9th Dist, Summit Co.

No. 3241. Decided April 2, 1940.

W. J. Laub, Akron, for appellant.

Smoyer, Kennedy, Smoyer & Vogel, Akron, for appellee.

### OPINION

By DOYLE, J.

Katherine Milliken died testate in September, 1929. Her executor claimed, as a part of her estate, much of the household goods, furniture, furnishings and jewelry found in her residence and in bank safety deposit boxes. as well as other chattel property owned by the testator. The many pieces of personal property were inventoried as a part of the estate of the deceased and duly appraised.

Several years subsequent to the decease of the testator, her executor deceased, and an administrator de bonis non, with will attached, was appointed by the Probate Court. A second inventory was then taken at his request. and an appraisement made of the remaining chattel assets. Included in this

inventory was the same chattel property heretofore mentioned as a part of the first inventory, with the exception of that which had been sold by the executor.

Carita McEbright was the sister of the testator and a legatee in her will. She filed exceptions to the second inventory and claimed that she was the owner of the household goods. furniture, jewelry and furnishings listed in the said inventory. Her right to file the exceptions was challenged by the administrator de bonis non, and the Probate Court, upon motion, dismissed the exceptions. This court, on appeal from that order, reversed the action of the Probate Court, and contemporaneous therewith instructed the Probate Court to hear and determine the exceptions of the exceptor. **In re Estate of Milliken, 24 Abs 650.**

The matter of the exceptions of Carita McEbright then came on for hearing. Final judgment was thereupon entered. Appeal was then taken to the Common Pleas Court for a trial de novo, which court found the property to be assets of the estate and overruled the exceptions. From that judgment of the Common Pleas Court the exceptor has appealed to this Court on questions of law. It is her claim here that the property found by the Common Pleas Court to be property of the estate is in truth and fact her property, and that the findings and judgment of the court are contrary to law and against the weight of the evidence. It is asserted that part of the assets claimed for the estate had become her property by way of gift and devise from her ancestors, and that the remainder was hers by reason of a gift from her sister, Katherine, made months before the said sister's death.

The evidence discloses an unusually close family relationship. covering a period of more than half a century.

It is common knowledge that Dr McEbright, after serving in the army of the Potomac in the Union cause, settled in Akron in 1864. Two children were the issue of his subsequent marriage— Carita (the exceptor in this case) and Katherine (now deceased).

In 1893, Katherine married Dr. C. W. Milliken. After the marriage the two families continued to live in the McEbright family residence on High street in the city of Akron.

In 1903, and after the death of Dr. McEbright, Mrs. McEbright (the widow), Dr. and Mrs. Milliken, and Carita moved to a new home on East Market street. This home was almost entirely furnished with the household goods and furnishings which the daughter and their mother had inherited from Dr. McEbright, with the exception of several casual pieces of furniture which were purchased by Dr. Milliken and given by him to Carita and his wife, Katherine.

Most of the purchase money for the new home was obtained from the sale of the old High street home which had been inherited by the daughters. Subsequent to the change of residence, the mother, Mrs. McEbright, died, and the daughters inherited the chattel property which belonged to her. This included jewelry, trinkets, dishes, and other almost innumerable things which had been accumulated over the years.

The cost of maintaining the household was borne by both Dr. Milliken and Carita McEbright. The doctor practiced his profession and Carita taught in a local college and university. It may be safely asserted that, from the beginning, the members of this household had lived as one family, and that each had depended upon the others for care and support. And it may be further safely asserted, that, after the death of Mrs. McEbright, the furniture and furnishings were recognized by all as the property of both Carita and her sister, Katherine. Typical of the evidence is the following testimony of Carita:

"Q. * * * How was the expense of maintaining the home borne * * * ?
"A. Well, Dr. Milliken was the head of the house, and he paid many bills, but I also had an interest in maintaining—in many things, and if there was anything that I was called upon to do, I never hesitated. I had a good salary

in those days, and I paid. I didn't live there on their bounty. It was part my home.

"Q. It was part your home?

"A. Most decidedly, and Dr. Milliken made me feel so in every way, and I felt that I should bear my part of it."

The case is replete with evidence which can lead to but one conclusion, and that is that from the years during which the household was presided over by the Civil War surgeon McEbright, on through the years which tolled the death of Dr. and Mrs. McEbright and Dr. and Mrs. Milliken, there was but one household maintained by Dr. McEbright, Dr. Milliken, and Carita, the latter by means of her salary as a teacher in Buchtel College and Akron University. There was a common ownership of the furniture and furnishings. Carita and Katherine (Mrs. Millik n) owned it in common.

Included in the inventory were many items of jewelry, dishes, etc. The undisputed evidence shows that some belonged to Carita and some to Katherine, and some to have passed to them in common from their parents. There are many heirlooms listed in the inventory. A typical part of the testimony of Carita follows:

"Q. How did you acquire this property * * * ?

"A. My mother was one of a big family, and the older sons and daughters of the sisters were the age of my mother, and when my sister and I came along, we were the only two of that generation.
" * * *

"The Court: Just answer how you claim you got it.

"A. Gifts, heirlooms.

"Q. From whom?

"A. From relatives, and I bought some of them, and presents, but the biggest part of my property is heirlooms, gifts from the relatives, from the grandparents and aunts."

In 1921, Dr. and Mrs. Milliken and Carita, before embarking together on a trip abroad, prepared a list of the contents of the house and of their personal belongings, and after each item a value was placed. There was listed household goods, furnishings, jewelry, and hundreds of miscellaneous items. Some of the items listed were owned by the exceptor alone, some by the sister Katherine alone, and some were owned jointly. The list was prepared for insurance purposes and placed in a safety deposit box until their return.

In 1929, several months prior to the death of the decedent, the evidence shows the decedent to have requested her sister, Carita, to bring to her the inventory which had been prepared many years before. It was kept in a desk drawer. After receiving the list from her sister, the decedent placed it in the exceptor's hands and said: "I want to give you—I'm giving you everything now. I'm giving you everything in this house that is mine and mine and yours together, a complete gift to you. I want you to take it. You have a note against Dr. Milliken and me for three thousand dollars, and you have done much over the months and years, you have given and done much, and I will feel very much better if you will take it now and do what you want to with it. Sell it or give it away or do what you please while I'm living, not after my death."

Following this conversation, much of the jewelry was placed in a bank safety deposit box or vault by Carita. The hundreds of other articles set out in the inventory were allowed to remain where they had always been kept, in the various parts of the house, and under the dominion and control of Carita.

The rules of long standing in this state, essential to support a gift inter vivos, and more recently pronounced in **Bolles v Toledo Trust Co., Exr. et, 132 Oh St 21, 7 OO 60**, and **Streeper, Admr. v Myers et, 132 Oh St 322, 8 OO 78**, are: 1. An intention on the part of the donor to transfer the title and right of possession of the particular property to the donee then and there; and 2. In pursuance of such intention, a delivery by

the donor to the donee of the subject-matter of the gift to the extent **practicable** or **possible, considering its nature,** with relinquishment of ownership, dominion and control over it.

The evidence warrants the conclusion that the decedent then and there intended to transfer to Carita the title and right of possession to all of her property set out in the inventory. And while it is a fact that the donor did not actually take into her hands and manually give over to the donee the hundreds of articles of personal property which are the subject of this controversy, she did nevertheless permit the donee to take many articles of jewelry to the donee's bank depository, and, in several instances, when persons requested her to sell to them household furnishings, etc., she each time referred them to her sister,. with the comment that the articles then belonged to her. At all times after the verbal gift set out hereinbefore, the grantee assumed the possession and control of all of the property, with the acquiesence of the donor.

It is our conclusion that the acts of the grantee, when coupled with the purpose of the grantor to treat the property as delivered when she gave over to the sister the inventory, was sufficient to pass the title. And this is especially so when it is recalled that much of the property had been jointly used by the parties for many years, that all of it was located in their joint home, and that much of it had been in a sense communal property of this most unusual family for many years.

From all of the circumstances attendant upon this case, we are of the opinion that the language used, as well as the occasion, indicated a clear intention of Katherine to pass the title to all of her property to her sister, Carita, and that the presumption is clear that it was Carita's intention to accept the gift. The evidence is also convincing that, immediately after the words of gift, Carita assumed and exercised the dominion of an owner, and took and retained such possession as

the nature of the property and the circustances permitted.

There is evidence in the record disclosing that the decedent had executed a will in which Carita was the residuary legatee. There is likewise the testimony of various witnesses to whom the decedent had stated that she had given everything to her sister, Carita. While, under certain circumstances, statements of this character might be construed as meaning that everything had been given to her sister by will, we are of the opinion, under the circumstances of this case, coupled with the positive testimony on the question of a gift in praesenti, that the decedent had reference only to the gift inter vivos and not the devise by will.

In view of all of the facts and circumstances shown by this record, we attach no significance to the fact that the exceptor permitted some of her property to be sold by the administrator and the proceeds from the sale thereof to be applied to the payment of obligations owing from this estate, of which estate the exceptor was a residuary legatee and at a time when she and everyone else considered that the estate was solvent.

It is our conclusion that reasonable minds can not reach, upon the evidence, any conclusion except one favorable to the claim of the exceptor; and this court, proceeding to render the judgment which the trial court should have entered, orders that final judgment be recorded in favor of the exceptor.

WASHBURN, PJ. &' STEVENS, J., concur.